IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**DANIEL CURTIS,**

        **Plaintiff,**

vs.                                                                                          Civ. No. 07-1127 JCH/LFG

**OFFICER GERALD R. SHELDON and
OFFICER NICK WILSON, individually
and in their official capacities as police
officers for the City of Albuquerque,**

        **Defendants.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's *Motion for Partial Summary Judgment on Liability*, filed May 6, 2008 [Doc. 21]. Plaintiff seeks summary judgment on any or all of his Fourth Amendment claims of false arrest, excessive force, and malicious prosecution, and on his First Amendment claim of speech retaliation. Although it is a close call, because the Court finds that genuine issues of material fact exist with respect to whether Defendants had probable cause for Plaintiff's warrantless arrest and subsequent prosecution, whether the force used to effectuate the arrest was excessive, and whether the arrest was in retaliation for Plaintiff's protected speech, the Court must deny the motion.

## FACTUAL BACKGROUND

This case involves a traffic stop in the early morning hours of May 12, 2007, that ultimately resulted in Plaintiff's arrest on a disorderly conduct charge. What led to that charge, as well as the charge's validity, is a matter of dispute, but the initial background is relatively straightforward. On the evening of May 11, 2007, Plaintiff, then a 22 year-old student at

University of New Mexico ("UNM"), drove over to the home of his friend Chris Wishinsky, where he met several other college-age friends, including his good friend Justin Baca. Justin was scheduled to graduate from UNM the next day. They drank shots at Chris's house to celebrate the end of the school year. Later, Chris dropped his friends off at a downtown nightspot. When their friend Dean Gallagher got off work around midnight, he drove to the nightspot to pick up three of his friends: Plaintiff, Justin Baca, and Aaron Manzanares. The four of them then drove in Dean's Ford Explorer over to the Frontier restaurant, an all-night eatery popular with college students.

  As the Explorer was about to turn into the parking lot of the Frontier, Aaron Manzanares prematurely took off his seat belt. From his patrol car, Defendant Officer Nick Wilson saw him take off his seat belt. As the friends pulled into the parking lot, Defendant Wilson pulled his patrol car behind the Explorer and engaged his emergency lights. He said that he had stopped them for a seatbelt violation, and he asked whether he should give the ticket to the driver or to the passenger who took off his seatbelt. Defendant Wilson then asked the driver and his three passengers for ID and returned to his vehicle to run warrant checks on them. The warrant check showed that Dean Gallagher had an outstanding warrant for Failure To Appear. Defendant Wilson returned to the Explorer, asked Dean to get out of the car, took him back to the police vehicle, and handcuffed him.

  At this point, Plaintiff, who had been riding in the back of the Explorer opened the door and started to take a step out. Whether he asked questions such as why his friend was being arrested and whether the rest of them were free to go eat is disputed, but it is undisputed that Defendant Wilson loudly ordered him to get back in the vehicle and that Plaintiff, after a few brief seconds complied when Wilson gave the order a second time. As he was closing the door,

Plaintiff swore and either said he had done nothing wrong or asked what he had done wrong. After that, he remained in the back seat with the doors closed and the windows up.

At that point, two other APD officers, Defendant Officer Gerald Sheldon and Officer Angelo Lovato appeared. These two officers were working "Chief's Overtime" on behalf of the restaurant. Although Defendant Wilson believed that the situation was under control once Plaintiff was back in the Explorer with the windows and door shut, he nevertheless pointed out Plaintiff to the other two officers. Justin Baca alleges that he heard Defendant Wilson identify Plaintiff to the officers by saying "that guy in the back, that tough guy, wants to take a ride." Defendant Wilson denies saying this, but admits that he pointed out Plaintiff as someone who he identified as a disturbance.

Defendant Sheldon approached the Explorer, opened the door, and engaged Plaintiff in a discussion. Plaintiff claims that Defendant Sheldon kept saying that he had done something wrong, but would not specify what Plaintiff had done that was objectionable. Plaintiff also claims that his demeanor was calm, and that he did not raise his voice in asking what he had done wrong. Defendant Sheldon claims that Plaintiff was screaming obscenities and stirring up a gathering crowd. Defendant Wilson claims that he was busy preparing paperwork on Dean Gallagher in his car and did not notice any disturbance.

Regardless of the circumstances, within a short time, Defendant Sheldon ordered Plaintiff out of the Explorer, and he complied. Defendant Sheldon then placed Plaintiff under arrest for disorderly conduct, and Plaintiff fully cooperated with the arrest. Plaintiff claims that Defendant Sheldon did not check the tightness of the handcuffs after placing them on Plaintiff, that he began to feel sharp pain and numbness very soon after being handcuffed, and that Defendant Sheldon ignored his complaints that the handcuffs were causing excruciating pain. Defendant Sheldon

claims that he made sure the cuffs weren't too tight and that he never heard Plaintiff complain. He also says that when he brought Plaintiff to Defendant Wilson's vehicle to be transported to jail, Defendant Wilson replaced the handcuffs with his own set. From the time Plaintiff was placed in Defendant Wilson's vehicle until he was brought into the jail, over three and a half hours elapsed. This was partly because the gate to the jail garage entrance was broken and they had to sit in the vehicle outside the gate for approximately two hours.

During the entire time Plaintiff was in Defendant Wilson's vehicle, he complained that the handcuffs were too tight. Defendant Wilson refused to check the cuffs or to loosen them. During this time, Plaintiff was sweating profusely and moving around in an attempt to find a less painful position. He claims that he eventually laid his head down in Dean Gallagher's lap in an attempt to elevate his wrists to get relief from the pain. Eventually, just before the jail gate was finally fixed, after over three and a half hours, Defendant Wilson loosened the cuffs. Plaintiff claims that Wilson said he would have loosened the cuffs sooner if he had realized they were so tight, but Wilson denies saying this.

Plaintiff was released from jail after approximately seventeen hours, thereby missing his good friend's graduation. None of the officers appeared at the court date on Plaintiff's disorderly conduct charge, and the charge was dismissed by the court. Plaintiff claims that, as a result of improper handcuffing, he has suffered nerve damage in his hand, causing permanent numbness.

## LEGAL STANDARDS

A. <u>Summary Judgment Standard</u>

Rule 56 of the Federal Rules of Civil Procedure provides for entry of summary judgment where "there is no genuine issue as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment is appropriate only if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995) (citation omitted).  In applying this standard, the record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment, in this case, the Defendants.  *See McKnight v. Kimberly Clark Corp.*, 149 F. 3d 1125, 1128 (10th Cir. 1998).

       The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  The opposing party may not rest upon "mere allegations and denials in the pleadings . . . but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (citation omitted). An issue of fact is genuine if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party.  *See id*. at 249.  "The nonmoving party must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citation omitted).

       B.  <u>Unlawful Arrest</u>

     A police officer may effect a warrantless arrest only if there is probable cause for the arrest.  *See Michigan v. DeFillippo*, 443 U. S. 31, 36 (1979).  "A police officer violates an

arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (citing *Tenn. v. Garner*, 471 U.S. 1, 7 (1985)). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonable trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995). It is "established law that 'the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention.'" *Cortez v. McCauley*, 478 F.3d 1108, 1117 (10th Cir. 2007) (quoting *Romero*, 45 F.3d at 1476-77). Probable cause does not require a finding of guilt beyond a reasonable doubt, or even proof of a prima facie case, but it does require the showing of a "substantial probability that a crime has been committed and that a specific individual committed a crime." *St. John v. Justman*, 771 F.2d 445, 448 (10th Cir. 1985).

  C. <u>Disorderly Conduct under New Mexico Law</u>

  Plaintiff was arrested and charged with committing disorderly conduct in violation of N.M. Stat. Ann. 30-20-1(A). This statute provides that: "Disorderly conduct consists of: engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace." *Id*. New Mexico courts have refined the definition of disorderly conduct, interpreting it in such a way to ensure that the statute does not "offend the first and fourteenth amendments' right of free speech." *State v. James M.*, 111 N.M. 473, 475 (Ct. App. 1990). New Mexico courts have found the statute constitutional to the extent that "it criminalizes only speech that 'tends to incite an immediate breach of the peace.'" *United*

6

*States v. Stenzel*, 49 F.3d 658, 662 (10th Cir. 1995) (quoting *State v. James M.*, 111 N.M. at 475). State courts have interpreted a breach of the peace under this statute to mean "an act of violence, or...an act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community." *State v. Florstedt*, 77 N.M. 47, 49 (1966).

In applying the disorderly conduct statute, "law enforcement officers are required to have a 'higher tolerance for offensive conduct and language.'" *Stenzel*, 49 F.3d at 662 (quoting *James M.*, 111 N.M. at 477). In addition, "one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer." *State v. Doe*, 92 N.M. 100, 102 (1978).

### D. First Amendment Speech Retaliation

In order to prevail on a claim of retaliation for exercise of a first amendment right, a plaintiff must show: "(1) he was engaged in a constitutionally protected activity, (2) defendant's actions caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity, and (3) defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Smith v. Plati*, 258 F.3d 1167, 1176 (10th cir. 2000). "An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *Poole v. County of Otero*, 271 F.3d 955, 961 (10th Cir. 2001) (quoting *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 19990)).

In order for speech to be constitutionally protected, it must not consist of "fighting words." *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982). The Tenth Circuit has defined fighting words as "epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, and (3) playing no role in the expression of ideas." *Cannon v.*

*Denver*, 998 F.2d 867, 873 (10th Cir. 1993). The *Cannon* court noted that "it has been stated that 'fighting words are not a means of exchanging views, rallying supporters or registering a protest; they are directed against individuals to provoke violence or inflict injury." *Id*. at 873 n. 4 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 401 (1992) (White, J. concurring)). To be punishable, words must go beyond bothering the listener; they must be nothing less than "an invitation to exchange fisticuffs." *Texas v. Johnson*, 491 U.S. 397, 409 (1989).

With respect to a case such as this, "[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. Speech is often provocative and challenging....[b]ut it is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Houston v. Hill*, 482 U.S. 451, 461 (1987). Verbal protest directed toward a police officer, even if vulgar and abusive in nature, is protected speech as long as it does not rise to the level of fighting words. *See, e.g., United States v. McKinney*, 9 Fed. Appx. 887 (10th Cir. 2001) (finding that a person who twice told an officer to "go f*** himself" engaged in protected speech); *Stone v. Juarez*, No. 05cv508, 2006 U.S. Dist. LEXIS 27272 (D. N.M., April 23, 2006) (finding that, as a matter of law, yelling "f*** you" at a police officer, even in a crowded mall, is protected speech and a disorderly conduct arrest for doing so violated the plaintiff's constitutional rights).

    E.  <u>Excessive Force</u>

Simply because an arrest is unlawful, the force used to effect such an arrest is not automatically excessive. Instead, "in cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it." *Cortez v. McCauley*,

478 F.3d 1108, 1127 (10th Cir. 2007). As long as a plaintiff is able to "prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest." *Id.* In order to receive damages from an excessive force claim, a plaintiff must prove that an officer "used greater force than would have been reasonably necessary to effect a lawful arrest." *Id.* These are two separate and independent inquiries.

Looking at how much force is reasonably necessary to effect a lawful arrest, the Supreme Court has explained that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The degree of physical coercion that law enforcement officers may use is not unlimited, however, and "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395. In defining the parameters of this reasonableness standard, the *Graham* Court stated that the nature and quality of the intrusion on the individual's Fourth Amendment rights must be balanced against the countervailing governmental interests at stake, taking into account the facts and circumstances of each particular case. The Court found that reviewing courts should especially focus on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (internal citations and quotations omitted); *see also Tenn. v. Garner*, 471 U.S. 1, 8-9 (1985) ("[T]he question [is] whether the totality of the circumstances justifie[s] a particular sort of . . .seizure.").

If a plaintiff meets the first prong of an excessive force claim, he must also demonstrate "some actual injury that is not *de minimis*, be it physical or emotional." *Cortez*, 478 F.3d at 1129,

9

n.25. Although the *Cortez* court, sitting *en banc*, held that the plaintiff's handcuff injuries were insufficient where he alleged only that the handcuffs left red marks on his wrists that were visible for days afterward, the court also found that "in some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight." *Id.* at 1129.

  F. Malicious Prosecution

  In order to prevail on a Section 1983 constitutionally-based claim of malicious prosecution, a plaintiff must prove that: 1) no probable cause existed for the prosecution; 2) the criminal action was terminated in favor of the plaintiff; 3) the prosecution was initiated maliciously; and 4) the Plaintiff was damaged. *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004). Clearly, the existence of probable cause for an arrest would be fatal to a malicious prosecution claim.

## DISCUSSION

  Viewing the evidence presented in the light most favorable to the non-movant, as required in this context, the Court finds that the Defendants have raised sufficient questions of fact such that summary judgment is inappropriate at this time.

  A. Unlawful Arrest, Speech Retaliation, and Malicious Prosecution

  The heart of Plaintiff's unlawful arrest, First Amendment speech retaliation, and malicious prosecution claims lies in the interaction he had with Defendant Sheldon after Defendant Sheldon approached the vehicle in which Plaintiff was sitting with the doors and windows closed. Based on the evidence before the Court, there is no question that, prior to Defendant Sheldon approaching Plaintiff, no probable cause existed to justify Plaintiff's arrest.

According to Defendant Wilson's deposition, after he had placed Dean Gallagher in the back of his police car and was in the process of taking him into custody, Plaintiff began to get out of the back seat of the vehicle in which he had been a passenger. It is undisputed that Plaintiff never got all of the way out of the vehicle, and, at most, had one foot on the ground. Although the record contains a dispute at this point concerning whether Plaintiff asked Defendant Wilson questions such as why his friend was being arrested, what the passengers in the car should do, and whether they could go inside the restaurant to eat, with Plaintiff and another witness in the car contending that he asked these questions and Defendant Wilson claiming that Plaintiff never said or asked anything, this dispute is not material because even if Plaintiff did not say anything while remaining half in and half out of the car, no cause existed to arrest him at this point.

Before Plaintiff fully stepped out of the car, Defendant Wilson ordered him to get back inside the car. Defendant Wilson contends that Plaintiff remained half in and half out of the car for several seconds[1] before Defendant Wilson again told him to get back in the car, at which time Plaintiff immediately complied. Defendant Wilson claims that as Plaintiff was closing the door to the car, Plaintiff yelled "I didn't do a f***ing thing wrong." Plaintiff instead contends that, as he closed the door, he turned to his friend Aaron Manzanares who was also in the back seat with him and asked "what the f*** did I do wrong?" Again, this dispute is not material because regardless of whether Plaintiff made a statement directed at Defendant Wilson or asked a question of his friend, no cause existed at this point to arrest him. *See State v. Doe*, 92 N.M. 100, 102 (1978).

---

[1] At his deposition, Defendant Wilson testified that Plaintiff "stood there for a second," before being ordered a second time to get back in the car, Plaintiff's Ex. 5 at p. 42: 2-3, and that he does not remember how many seconds elapsed between his first and second to get back into the car. *Id.*, p. 45: 7-11.

At this point, it is undisputed that Plaintiff was back inside the car, with the door closed and the windows up. In fact, Defendant Wilson admitted in his deposition that, in his opinion, "things were under control" at that time. *See* Plaintiff's Ex. 5 at p. 53: 11-13. At that point, Defendant Sheldon and Officer Lovato, two APD officers working Chief's Overtime that night at the restaurant, appeared on the scene. Despite believing that "things were under control," Defendant Wilson nevertheless directed the other two officers toward Plaintiff. In his deposition, Justin Baca testified that Defendant Wilson directed the other two officers toward Plaintiff by saying "[h]ey, that guy in the back, that tough guy, wants to take a ride." Defendant Wilson disputes this, but acknowledges that he pointed Plaintiff out to the two officers as a disturbance. *See* Plaintiff's Ex. 5 at p. 52: 7-15. Defendant Sheldon said in his deposition that he believes Defendant Wilson asked him to "deal with that guy over there" when he pointed out Plaintiff. *See* Plaintiff's Ex. 6 at p. 55: 6-7. Although the manner in which Defendant Wilson pointed out Plaintiff to the other officers is in dispute, this dispute is not material because it is undisputed that this occurred when Plaintiff was sitting in the back of the vehicle with the doors and windows closed, and no probable cause existed for an arrest at this point.[2]

At this point, the factual dispute over what happened next becomes material. According to Plaintiff, after he was pointed out by Defendant Wilson, Officer Lovato and Defendant Sheldon approached Plaintiff's door, opened the door, and said something to the effect of "we

---

[2] In *Defendants' Response to Plaintiff's Motion for Partial Summary Judgment* [Doc. 24], Defendants argue that because Defendant Wilson did not arrest Plaintiff, he did not personally participate in any alleged constitutional violation. *See* Doc. 24 at 16, n. 1. If Defendant Wilson pointed out Plaintiff as "someone who wants to take a ride," or even as a "disturbance," thereby putting in motion the events that led to Plaintiff's arrest despite Plaintiff not having done anything at that point to justify an arrest, it is implausible to suggest that he would not be a party to a constitutional violation even if he did not make the arrest himself.

12

have a problem here." *See* Plaintiff's Ex. 1 at p. 52-53.  Plaintiff asked what he had done wrong, and Defendant Sheldon told him "you have done something wrong here," but he would not specify what he believed Plaintiff had done wrong.  Within 30 seconds, after Plaintiff asked several more times what he had done wrong and did not receive a specific answer, Defendant Sheldon ordered Plaintiff out of the car, positioned Plaintiff's body up against the vehicle, and began to search Plaintiff.  Plaintiff continued to ask what he had done wrong, why he had been pulled out of the vehicle, and why he was being searched.  Defendant Sheldon simply kept saying "you have done plenty wrong."  At that point, Plaintiff said "if I have done plenty wrong, go ahead and arrest me," whereupon Defendant Sheldon immediately handcuffed Plaintiff and placed him on the ground.  *Id.* at p. 53-54.  Plaintiff claims that he never yelled or used profanity when speaking with Defendant Sheldon.  *Id.* at p. 56.  According to Dean Gallagher's deposition, he heard Plaintiff ask Defendant Sheldon "hey man, what's going on?" immediately before being arrested.  *See* Plaintiff's Ex. 7 at p. 23: 17-18.  He also said that, while interacting with Defendant Sheldon, Plaintiff's voice was "calm" and he was not yelling at all.  *Id.* at p. 24: 13-14.

Not surprisingly, Defendant Sheldon offers a very different account of events.  According to Defendant Sheldon, he never told Plaintiff that he had done something wrong.  *See* Plaintiff's Ex. 6 at p. 56:4-8.  Instead, Defendant Sheldon insists that Plaintiff was sitting in the car yelling profanities and he only approached the car "to defuse the situation."  *Id.* at p. 58-60.  He told Plaintiff several times that he needed "to stop with [his] profanity and [his] conduct" and that when Plaintiff refused, he arrested him.  *Id.* at p. 60.  At his deposition, Defendant Sheldon could not recall anything specific that Plaintiff was yelling; he just characterized it as "curse words, profanity, miscellaneous stuff."  *Id.* at p. 36: 11-12.  Significantly, Defendant Sheldon claims that when Plaintiff was screaming, "to me, it started to stir everyone else up."  *Id.* at p. 35: 23-24.

13

Defendant Sheldon went on to say that when Plaintiff was yelling "everyone was gathering....It was causing a disturbance....People were stopping, watching what was going on. It was perceived to be something that could have got bad if I hadn't placed him under arrest. I gave him – I told him, you know, 'you need to calm down, stop using this language in front of everyone.'" *Id*. at p. 39: 16-24. At his deposition, Officer Lovato said that Plaintiff had used profanity, although he could not recall anything specific that he had said. *See* Plaintiff's Ex. 4 at p. 20: 12-14. He also claimed that Plaintiff was arrested because of "the aggression in his voice," although he admitted that Plaintiff "never acted out." *See id.* at p. 38-39.

Contrary to Plaintiff's contention that arresting him purely for his speech is illegal in New Mexico, under the circumstances suggested by Defendant Sheldon in his deposition (which must be accepted as true for purposes of this summary judgment motion), probable cause for an arrest for disorderly conduct could have existed. Certainly, Plaintiff is correct that merely questioning a police officer, even in an aggressive and obscene manner, is insufficient to justify an arrest for disorderly conduct. *See State v. Doe*, 92 N.M. 100 (1978); *State v. Hawkins*, 128 N.M. 245 (Ct. App. 1999). Additionally, there is no indication from any deponent that Plaintiff's alleged profanities were "an invitation to exchange fisticuffs" with the police or any bystander, *Texas v. Johnson*, 491 U.S. 397, 409 (1989), and therefore could not be considered "fighting words." However, the alleged presence of a gathering crowd and Defendant Sheldon's perceptions of the effect of Plaintiff's alleged words on that crowd could provide probable cause for an arrest for disorderly conduct based on his speech alone.

The presence of a crowd and the effect on the crowd of Plaintiff's words may enable this case to be distinguished from previous cases where courts have found that arrests for disorderly conduct were impermissible as a matter of law, such as *Doe* and *Hawkins*. In *Doe*, the defendant

was a passenger in a car that was pulled over. While officers were questioning the driver, the defendant got out of the car and started arguing with the officers in a loud voice, demanding to know why they had been stopped. He was angry and had his fists clenched, but made no movement toward the officers. After several warnings, the officers arrested defendant. The officer stated that he arrested the defendant "because he was getting angry 'and with his actions I didn't know that at any time he might go ahead and become combative.'" *Id*. at 102. Despite defendant's words and aggressive actions, the New Mexico Supreme Court held that there was no probable cause for his arrest, let alone sufficient evidence to sustain a conviction. The Court found that "at the time of the arrest, the defendant was not 'combative,' nor was it apparent that his words or actions would produce violence or disturb the peace." *Id*. In reaching its decision, however, the Court noted that "[t]here was no evidence that a crowd was gathering, that the defendant was inciting belligerent behavior, or that the defendant was causing consternation or alarm." *Id.*

In *Hawkins*, the Court of Appeals found insufficient evidence to sustain a disorderly conduct conviction when the defendant advanced toward police officers in his back yard while waving his arms and screaming "[t]his isn't a f***ing crack house. Get out of my f***ing yard." 128 N.M. at 246. To justify the arrest, the officers cited the offensive manner in which the statements were yelled, the fact that they were yelled in a residential neighborhood, and the possibility that workmen in the defendant's yard would be incited to aid the defendant and precipitate a breach of the peace. The court found that concerns about potential conduct by the workmen were mere speculation, and "there was no evidence that they were negatively affected by or reacted in any way to the statements." *Id*. at 248. Similarly, the court held that "[t]he mere fact that people may have heard Defendant's remarks, however loud and offensive they may have

15

been, is insufficient to support a charge of disorderly conduct. There must be evidence that the remarks were likely to incite the listeners to breach the peace." *Id*. Thus, viewing his statements in the light most favorable to the non-movant, Defendant Sheldon's contentions that Plaintiff was attempting to incite onlookers to breach the peace or that his words were having that effect demonstrate probable cause for Plaintiff's arrest for purposes of summary judgment, so Plaintiff cannot conclusively demonstrate Defendants' liability for illegal arrest, first amendment speech retaliation, or malicious prosecution at this point.

### B. Excessive Force

Regarding Plaintiff's claim for excessive force, sufficient issues of material fact also exist such that summary judgment is inappropriate at this time. In evaluating the reasonableness of the force used against Plaintiff, the Court must first look at the factors laid out in *Graham v. Connor*, 490 U.S. 386, 396 (1989). The first *Graham* factor, the severity of the crime at issue, weighs in favor of Plaintiff's claim. Disorderly conduct, a misdemeanor, is a relatively minor crime. The second *Graham* factor, whether the suspect poses an immediate threat to the safety of the arresting officers or others, which must be the primary focus of the Court's reasonableness inquiry, *see Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001), partially weighs in Defendants' favor for summary judgment purposes. Taking as true Defendant Sheldon's deposition testimony regarding his concern that Plaintiff's actions were endangering the safety of officers and others and his statement that "[o]nce those handcuffs are on, he didn't really want to yell and scream anymore...that stopped it right away," Plaintiff's Ex. 6 at 60: 18-20, the use of handcuffs on Plaintiff to effect an arrest appears reasonable. Of course, the use of handcuffs may be reasonable while the manner in which they are used is not. Finally, the third *Graham* factor, whether the suspect is resisting arrest or attempting to evade arrest by flight, weighs strongly in

Plaintiff's favor.  Defendant Sheldon does not dispute that Plaintiff fully cooperated with the arrest, *id.* at 60: 21-23, and Defendants point to no evidence of resistance or attempted flight.

However, two areas of unresolved questions prevent the Court from being able to grant summary judgment on Plaintiff's excessive force claim: whether Defendants used reasonable force in restraining Plaintiff, and whether the injuries suffered by Plaintiff were sufficiently serious.  With regard to the reasonableness of force, the Court has already determined that, for summary judgment purposes, the use of handcuffs was reasonable.  What cannot be resolved at this point is whether the Plaintiff was handcuffed unreasonably tightly and, if so, whether the Defendants should have noticed and remedied this.

Plaintiff alleges that when Defendant Sheldon handcuffed him, he felt severe pain and numbness almost immediately.  He claims that Defendant Sheldon never checked the tightness of the cuffs, that Defendant Sheldon ignored him when he complained that the cuffs were on too tightly, and that he had the same set of handcuffs on until he was taken into the jail almost four hours later.  In contrast, Defendant Sheldon claims that he checked the tightness of the cuffs by putting his finger between the cuffs and Plaintiff's wrist, that he never heard Plaintiff complain that the cuffs were too tight, and that he took his own cuffs back and had Defendant Wilson cuff Plaintiff when Plaintiff was placed in Defendant Wilson's car for transport to jail.  Each of these disputed points is material in judging the reasonableness of Defendants' actions and which defendant, if any, would be liable for using excessive force.

Plaintiff claims that once he was in Defendant Wilson's squad car, he complained repeatedly to Wilson about the pain, as much as every few minutes.  He claims that Defendant Wilson refused to loosen the cuffs for over three and a half hours and that, in response to Plaintiff's complaints, Wilson said "well, they're supposed to be tight" several times.  He also

17

claims that he was sweating profusely from the pain and in such agony that he laid his head down in Dean Gallagher's lap in the back of the police car, in an attempt to find a position that put less pressure on his wrists. After several hours, Defendant Wilson finally agreed to loosen Plaintiff's cuffs. Plaintiff claims that, when he did so, Defendant Wilson said "I didn't realize you were handcuffed that way; if I had known, I probably would have loosened them earlier."

Defendant Wilson admits that he was asked repeatedly to loosen the cuffs and that he refused to do so, and also admits that he observed that Plaintiff was sweating and moving around in the back seat, but that the sweating could have been caused by the heat and that most arrestees move around to get comfortable, and Plaintiff's actions were not out of the ordinary. Defendant Wilson said that it is his habit and routine to always check the tightness of cuffs prior to transporting arrestees, and that while he could not be 100 percent sure that he did so in this case, he is virtually certain that he did. He also denied ever having said something to the effect that he would have loosened the cuffs sooner if he had known the manner in which Plaintiff was cuffed. Because the cornerstone of an excessive force complaint is the reasonableness of the officers' behavior, these disputed issues are material.

Plaintiff also contends that he has permanent, untreatable nerve damage in his hand as a result of the prolonged period in which his cuffs were too tight. If proven, this would be an injury of sufficient gravity to meet the "actual injury that is not *de minimis*" standard set out in *Cortez*, 478 F.3d at 1129, n.25. Plaintiff has not submitted any medical records or other relevant exhibits with his motion for summary judgment, and relies entirely on his own deposition testimony. Defendants have come forth with some evidence that could call into question the severity of Plaintiff's injury, such as the allegation that Plaintiff did not mention the injury or seek medical attention when undergoing the medical history and screening process during his arrest booking,

that Plaintiff could sign documents at his booking with his allegedly injured hand, and that Plaintiff's friend did not notice anything visibly wrong with Plaintiff's wrist approximately two weeks after the accident. Because the severity of the alleged injury goes to liability as well as damages, it is an issue of material fact that precludes summary judgment without further evidence.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's *Motion for Partial Summary Judgment on Liability*, filed May 6, 2008 [Doc. 21] is DENIED.

_____
**UNITED STATES DISTRICT JUDGE**